IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
1:21 CR 54 MR WCM

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | MEMORANDUM AND |
| | ) | RECOMMENDATION |
| RICHARD TODD FRADY | ) | |
| | ) | |
| _____ | ) | |

This matter is before the Court on Defendant's Motion to Suppress (Doc. 12), which has been referred to the undersigned pursuant to 28 U.S.C. § 636 for the entry of a recommendation.

I. **Relevant Procedural Background**

On June 1, 2021, Defendant Richard Todd Frady was indicted on one count of possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g), one count of possession with intent to distribute more than 50 grams of actual methamphetamine in violation of 21 U.S.C. § 841(a)(1), and one count of possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A). Doc. 1.

On June 23, 2021, Defendant made an initial appearance and counsel was appointed for him. On the same date, Defendant was arraigned and entered a plea of not guilty.

1

On August 20, 2021, Defendant filed the Motion to Suppress and a supporting memorandum. Docs. 12, 13. The Government responded on August 27, 2021. Doc. 15.

On September 27, 2021, the undersigned held an evidentiary hearing on the Motion.

II. Factual Background

A. Legal Standard

Findings of fact may be made by a district court when deciding a motion to suppress. See United States v. Stevenson, 396 F.3d 538, 541 (4th Cir. 2005). "When material facts that affect the resolution of a motion to suppress . . . are in conflict, the appropriate way to resolve the conflict is by holding an evidentiary hearing after which the district court will be in a position to make findings." United States v. Taylor, 13 F.3d 786, 789 (4th Cir.1994). In doing so, the court determines "the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence." United States v. Gualtero, 62 F. Supp. 3d 479, 482 ((E.D. Va. 2014) (citing United States v. McKneely, 6 F.3d 1447, 1452-53 (10th Cir. 1993)).

B. Evidence Presented

At the hearing, the Government called the following witnesses, all of whom are associated with the Burke County Sheriff's Department: Deputy

2

Rocky Xiong,[1] Detective Stephen Ritchie, and Investigator Aaron Moore. The Government also offered, without objection, the relevant search warrant and associated materials, which have been filed as Document 15 – 1.

Defendant did not present any evidence.

### C. Factual Findings

Based on the information of record and as presented during the hearing, the undersigned finds the relevant facts to be as follows:

On February 6, 2020, Deputy Xiong applied for a warrant to search the premises located at 1726 Suburban Drive, Lot 17, Morganton, North Carolina. Law enforcement believed that Defendant was using the property as a distribution point for the sale of narcotics and had conducted two controlled purchases of narcotics from Defendant using a confidential informant.

A North Carolina judicial officer issued the warrant ("Search Warrant") on the morning of February 6, 2020.

Law enforcement had information that Defendant generally left the residence, which was a single wide trailer located in a mobile home park, each afternoon to go to work.

From previous encounters, law enforcement personnel were also aware that both Defendant's father, who had hearing difficulties, and Defendant's

---

[1] At the time of the events in question in February 2020, Deputy Xiong was an investigator. He recently became a reserve deputy.

girlfriend had been living at the property. Consequently, Sheriff's Office personnel planned to monitor the residence, watch for Defendant to leave to go to work, and then detain him and execute the Search Warrant. Detective Ritchie testified specifically that law enforcement planned to use Defendant's keys to make entry into the residence.

Accordingly, on the afternoon of February 6, 2020, numerous officers from the Burke's County Sheriff's Office were in the vicinity of the residence. Deputy Xiong was conducting surveillance from approximately 60 to 80 yards away when he saw Defendant walk out of the residence and go to a nearby motor vehicle. Defendant obtained a small lockbox ("Lockbox"), approximately 12 inches square, from the vehicle's trunk and took it inside the residence. Shortly thereafter, Defendant exited the residence, entered a second motor vehicle, and began to drive away. The Government's evidence indicated that law enforcement had seen Defendant use both vehicles.

Deputy Xiong relayed this information to other law enforcement officers.

At the time, Investigator Moore was located up the road from Defendant's residence and was assigned with stopping Defendant's vehicle. Consequently, when Defendant left the residence and began driving, Investigator Moore activated his lights and sirens and, along with other law enforcement vehicles, stopped Defendant's vehicle.

4

Investigator Moore spoke briefly with Defendant and asked if he could move Defendant's vehicle. Defendant did not respond. At that point, Investigator Moore removed Defendant from his vehicle. Detective Ritchie, who was also at the stop, obtained Defendants' keys from him and gave them to Investigator Moore so that Investigator Moore could move Defendant's vehicle. Investigator Moore then drove Defendant's vehicle back to the residence. Defendant was placed in a law enforcement vehicle operated by Detective Smith and also taken back to the residence.

There, Detective Ritchie retrieved Defendant's keys from Investigator Moore and law enforcement officers assembled in front of the residence in preparation for making entry. Detective Ritchie was at the front of the line and the first person at the door.

Detective Ritchie was prepared to use one of Defendant's keys to open the front door. He testified that, while law enforcement could have broken down the door if necessary, given that Defendant's father was hard of hearing, they were hesitant to do so. Specifically, Detective Ritchie indicated that he was concerned that using a battering ram on the door to the single wide trailer would shake the entire structure thereby scaring the occupants, particularly Defendant's father who would not be able to hear law enforcement announce themselves before coming in.

The officers announced their presence and then entered the residence, though Detective Ritchie discovered that the front door was already unlocked and therefore did not need to use a key.

After making entry, the officers fanned out in a predetermined fashion through the residence. Detective Ritchie testified that, in the process, he tossed the keys onto a couch or the floor in the living room so that he could have one free hand while being able to use the other to hold his pistol.

Defendant's father and Defendant's girlfriend were detained without incident and the residence was cleared.

During this time, Defendant remained in Detective Smith's vehicle and was in handcuffs.

After the residence was secured, Deputy Xiong and Investigator Moore approached Defendant in Detective Smith's vehicle. Deputy Xiong testified that he and Investigator Moore got into the backseat of the vehicle, while Detective Smith was seated in the driver's seat and Defendant was located in the front passenger seat. Investigator Moore's recollection differed somewhat; he recalled that he and Deputy Xiong did not enter the vehicle but he did not remember if Defendant was seated inside the vehicle with the window down or was standing outside the vehicle when Deputy Xiong spoke with him.

Deputy Xiong then spoke to Defendant and provided Miranda warnings. Deputy Xiong also read at least a portion of the search warrant to Defendant.

Defendant acknowledged that he understood his Miranda rights. Investigator Moore then asked Defendant if he would like to assist with the investigation or provide any information. Defendant gave no response, and therefore, Investigator Moore and Deputy Xiong began walking back toward the residence. As they were approaching the front door of the residence, Detective Smith blew her vehicle's horn, and Deputy Xiong and Investigator Moore returned to the vehicle.

At that point, Defendant stated that methamphetamine was located in a dresser in the residence, that scales were located in his father's room, and that a pistol was in the pocket of a jacket that was also in his father's room. With regard to the pistol, when questioned about it by Investigator Moore, Defendant stated that he had obtained it for his father's protection.

The evidence indicated that Defendant appeared sober and clearheaded and was calm throughout this exchange.

Investigator Moore then advised the officers who were in the house about the information Defendant had provided.

Deputy Xiong and Investigator Moore went back into the residence, finding the Lockbox in Defendant's father's bedroom.

Investigator Moore returned to Detective Smith's vehicle and asked Defendant about the Lockbox. In response, Defendant claimed ownership of the Lockbox and said that "meth and money" would be found inside it.

Investigator Moore went back to the bedroom where the Lockbox was located. He testified that a set of keys was in the bedroom and acknowledged that he (Investigator Moore) had the keys in the room but did not recall giving them specifically to Deputy Xiong. Deputy Xiong, though, testified that Investigator Moore gave the keys to him. Deputy Xiong used the keys and opened the Lockbox.[2]

Inside the Lockbox, officers located a gallon sized bag of white crystalline substance, suspected to be methamphetamine, and a black wallet containing United States currency.

### III. Discussion

In the Motion, Defendant argues for the suppression of his statements to law enforcement and the evidence found in the Lockbox.

#### A. Defendant's Statements to Law Enforcement

The Fifth Amendment ensures that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V; United States v. Nielsen, 640 F. App'x 224, 227 (4th Cir. 2016). To protect this right, when a suspect is subjected to a "custodial interrogation," he must be warned that "he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence

---

[2] Deputy Xiong testified that the keyring had at least three keys—one each for the residence, Defendant's vehicle, and the Lockbox.

of an attorney, either retained or appointed." Miranda v. Arizona, 384 U.S. 436, 444 (1966).

Here, the Government does not argue Defendant was not in custody when Defendant spoke to law enforcement; indeed, he was in handcuffs and in or near Detective Smith's vehicle, with multiple officers present.

In his Motion, Defendant argues that his statements to law enforcement should be suppressed because he was not Mirandized before being questioned and that he did not waive his Fifth Amendment rights.

"The waiver inquiry 'has two distinct dimensions': waiver must be 'voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception,' and 'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" Berghuis v. Thompkins, 560 U.S. 370, 382-83 (2010) (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)). "The Government has the burden of proving, by a preponderance of the evidence, that the defendant's waiver of his Miranda rights was knowing and voluntary." United States v. Robinson, 404 F.3d 850, 859 (4th Cir.2005).

In this case, the evidence indicates that Deputy Xiong advised Defendant orally of his Miranda rights while Detective Smith and Investigator Moore were present.

9

The Government's evidence is inconsistent regarding the exact location of these individuals at the time; Deputy Xiong testified that all four individuals were inside Detective Smith's vehicle, while Investigator Moore testified that he never entered Detective Smith's vehicle and recalled that he and Deputy Xiong were standing outside the vehicle while Defendant was either seated in the vehicle with the window down or also standing outside the vehicle.

As Defendant points out, law enforcement did not present a written form for Defendant to sign to acknowledge he was waiving his right to remain silent nor did they record Defendant's waiver by audio-visual means. Such information could have made the evidence in this case more explicit.

Nonetheless, the undersigned is persuaded that the Government has shown, by a preponderance of the evidence, that Defendant knowingly and willingly waived his right not to speak with the officers.

Deputy Xiong advised Defendant of his Miranda rights and Defendant confirmed he understood. Defendant's initial decision to decline to respond when asked by Investigator Moore if he wished to speak with law enforcement also indicates he was aware of his rights.

Further, there is no evidence that force or pressure was applied to coerce Defendant into waiving his right to remain silent.

Defendant argues that, in light of his initial silence when asked if he wanted to speak, the officers should have again given Miranda warnings to

Defendant upon returning to the vehicle. Providing Defendant with additional warnings could have confirmed further his understanding of his rights. However, it is not clear that the officers had much of an opportunity to do so before Defendant began speaking; both Deputy Xiong and Investigator Moore testified that, when they reached Detective Smith's vehicle, Defendant provided information concerning methamphetamine, scales, and a firearm voluntarily and without questioning.

Detective Smith did not testify at the hearing and no evidence was otherwise presented by the Government as to what transpired in Detective Smith's vehicle from the time Deputy Xiong and Investigator Moore started to approach the house and the time Detective Smith signaled them with the vehicle's horn. Such evidence would also have been helpful in creating a more complete record.

However, the undersigned is not convinced that this omission prohibits the Government from carrying its burden. The period of time that elapsed between Deputy Xiong and Investigator Moore leaving Detective Smith's vehicle and her signal to them was short, making the possibility that Detective Smith could have pressured Defendant into waiving his rights during that time remote, and Defendant has not suggested otherwise. Further, the evidence indicates that throughout his encounter with law enforcement, Defendant remained calm and level-headed.

11

Case 1:21-cr-00054-MR-WCM   Document 19   Filed 10/26/21   Page 11 of 19

With respect to his subsequent statements to Investigator Moore regarding the contents of the Lockbox, while it may have been prudent to provide Defendant with additional Miranda warnings, by this point Defendant had been advised of his rights, had initially invoked them by remaining silent when asked if he wanted to assist with the investigation, and had subsequently and voluntarily provided information. Further, Defendant was calm, and there has been no indication that any improper force was applied against Defendant while he remained in Detective Smith's vehicle prior to Investigator Moore's questions to him about the Lockbox.

The undersigned will therefore recommend that Defendant's motion be denied on this basis.

### B. The Lockbox

With regard to the Lockbox, Defendant argues that the search of its interior was improper because law enforcement personnel were not permitted to use Defendant's key to open the Lockbox without Defendant's consent.

The Search Warrant authorized the search of the single wide mobile home located at 1726 Suburban Drive, Lot 17, Morganton, North Carolina and the seizure of multiple categories of items including:

> 5. United States currency, precious metals, jewelry, valuables and financial instruments, including stocks, bonds, money orders and cashier's checks in amounts indicative of the proceeds of illegal drug trafficking. Items evidencing drug trafficking, including but not

12

> limited to scales, weights, baggies, and other related drug paraphernalia.
>
> 6. Any safe or 1ock box used to secure, conceal, and/or protect controlled substances, documents, or United States currency derived from ill-gotten gains.
>
> _____
>
> 12. Contraband, specifically, Methamphetamine.

Doc. 15 – 1 at 4.

Defendant acknowledges that the Search Warrant authorized law enforcement to seize the Lockbox itself; he argues, however, that law enforcement's use of the key, without Defendant's consent, was unlawful. Doc. 13 at 4 ("Mr. Frady does not contest that the lockbox could be seized; what is unconstitutional is the taking of the key to the lockbox without his consent.").

It is well settled that:

> A lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search. Thus, a warrant that authorizes an officer to search a home for illegal weapons also provides authority to open closets, chests, drawers, and containers in which the weapon might be found.

United States v. Ross, 456 U.S. 798, 820-21 (1982); see also United States v. Brown, 958 F.2d 369 (4th Cir. 1992) (per curiam) (unpublished) (relying on Ross and rejecting defendant's argument that search of refrigerator, which

13

revealed cocaine, exceeded the scope of a search warrant authorizing the police to search for books, paper ledgers, etc.).

Other courts have upheld searches of locked areas pursuant to a warrant authorizing the search of the overall premises. United States v. Fagan, 577 F.3d 10, 14 (1st Cir. 2009) (finding an appurtenant locked closet just outside the front door of apartment could be searched); United States v. Johnson, 1:21-CR-26-HAB, 2021 WL 4059860, at *1, 8 (N.D. Ind. Sep. 7, 2021) (finding that a locked basement room labelled a "man cave" could be searched even though the warrant for the residence did not specify that room or the basement).

Because some of the items that could be seized pursuant to the Search Warrant, including United States currency and methamphetamine, could be found in the Lockbox, law enforcement was authorized to search that container for those materials. See e.g., United States v. Jordan, 485 F.Supp.3d 664, 671 (E.D. Va. 2020) ("While the search warrant did not give express authority to search the safe, it was reasonable for police officers executing the warrant to believe they would find in the safe the items for which they were authorized to search.").

Defendant does not appear to contest this point either but argues that the officers improperly used the key which had been taken from Defendant to access the Lockbox.

14

Case 1:21-cr-00054-MR-WCM   Document 19   Filed 10/26/21   Page 14 of 19

Some authorities have found, though, that a key which has been obtained legally by the police may be used to access a locked area during a search. See United States v. Herrera-Contreras, 269 F. App'x 875, 876–77 (11th Cir. 2008) (per curiam) (concluding that district court did not err in denying defendant's motion to suppress when keys seized pursuant to a lawful search incident to arrest were used in executing warrant to search premises and to unlock closet); United States v. Snow, 919 F.2d 1458, 1461 (10th Cir. 1990) (finding that district court did not err in refusing to suppress evidence obtained from a locked safe, which was a likely source for specified documents, which safe was accessed using keys seized from defendant); United States v. Russo, No. CR 05-00345-KD-C, 2006 WL 8446074, at *5 (S.D. Ala. May 23, 2006) ("Upon consideration, the court finds that the safety deposit box key was not outside the scope of the initial search because the warrant specifically allowed for the seizure of any locked container believed to contain the documentary evidence described. Moreover, there was a substantial basis presented to the Magistrate Judge to believe that a safety deposit box would contain the documentary evidence sought. Thus, the search was not unconstitutional.").

Here, Defendant relies on Carpenter v. United States, 585 U.S. __, 138 S. Ct. 2206, 201 L.Ed.2d 507 (2018) and contends that "a key to a lockbox is similar to a passcode on a cell phone." Doc. 13 at 4. However, the undersigned

15

Case 1:21-cr-00054-MR-WCM   Document 19   Filed 10/26/21   Page 15 of 19

is unable to locate support for this contention in Carpenter, where the Supreme Court held, among other things, that an individual maintains a legitimate expectation of privacy, for Fourth Amendment purposes, in the record of his physical movements as captured through cell-site location information and that the Government must generally obtain a search warrant supported by probable cause before acquiring cell-site location information from a wireless carrier.

Further, Defendant does not argue that law enforcement improperly took him into custody and does not explain why law enforcement should not have had possession of Defendant's keys.

Therefore, the undersigned is not persuaded that Deputy Xiong's use of Defendant's key to open the Lockbox was improper.

In the alternative, even if the actions of law enforcement were constitutionally inappropriate, the physical evidence found in the Lockbox should not be suppressed.

The inevitable discovery rule is an exception to the exclusionary rule for evidence discovered "as the tainted fruit of unlawful governmental conduct." Nix v. Williams, 467 U.S. 431, 441, 444 (1984) (internal quotation omitted).

> The Supreme Court first adopted the inevitable discovery doctrine in *Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). The Court held that information obtained by unlawful means is nonetheless admissible "*[i]f* the prosecution can

16

> establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Id.* at 444, 104 S.Ct. 2501 (emphasis added). . . . The Court concluded that if the government could prove that the evidence inevitably would have been discovered by legal means then "the deterrence rationale [of the exclusionary rule] has so little basis that the evidence should be received." *Id.* at 444, 104 S.Ct. 2501.
>
> United States v. Allen, 159 F.3d 832, 838-39 (4th Cir. 1998).

Here, law enforcement observed Defendant in physical possession of the Lockbox, carrying it from a vehicle into the residence where it was subsequently found. As described above, materials that the Search Warrant authorized law enforcement to seize could have been (and subsequently were in fact) found in the Lockbox. Consequently, even if the officers had not used Defendant's key, they were inevitably going to search the Lockbox and would have discovered its contents.

Therefore, the undersigned will recommend that Defendant's motion to suppress be denied on this basis as well.

## IV. Recommendation

For the foregoing reasons, the undersigned respectfully recommends that Defendant's Motion to Suppress (Doc. 12) be **DENIED**.

Signed: October 26, 2021

W. Carleton Metcalf
United States Magistrate Judge

## Time for Objections

The parties are hereby advised that, pursuant to Title 28, United States Code, Section 636(b)(1)(B), written objections to the findings of fact, conclusions of law, and recommendation contained herein must be filed within **fourteen (14)** days of service of same. **Responses to the objections must be filed within fourteen (14) days of service of the objections.** Failure to file objections to this Memorandum and Recommendation with the presiding District Judge will preclude the parties from raising such objections on appeal. See Thomas v. Arn, 474 U.S. 140 (1985).